**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**

SOUTHERN DISTRICT OF MISSISSIPPI
**FILED**
NOV 2 1 2022
ARTHUR JOHNSTON
BY _____ DEPUTY

**UNITED STATES OF AMERICA,**

**Plaintiff**

vs.                                        Case No: ~~15-CR-00001-2~~

1:15cr116-RHW-2

**KENNETH CASEY,**

**Defendant**

---

## MOTION FOR COMPASSIONATE RELEASE/REDUCTION IN SENTENCE, PURSUANT TO 18 USC § 3582(c)(1)(A) AND THE FIRST STEP ACT OF 2018.

---

### INTRODUCTION

Comes now, the Defendant, Kenneth Casey (Defendant), in the form of pro-se, respectfully asks this Court for a reduction in his sentence pursuant to 18 USC § 3582(c)(l)(A). The Defendant argues that the COVID-19 pandemic, BOP's mishandling of the pandemic, subsequent changes in laws, his prior convictions no longer qualify as predicates under USSG 4Bl.2 (career offender) enhancements, the US Supreme Court case, *Concepcion v. US*, 597 US _____ (June 27, 2022),

1

and his post sentencing rehabilitation, all qualify as extraordinary and compelling circumstances. See ***US v. Shkambj***, 993 F.3d 388, 393 (5th Cir. 2021) ("[N]either the policy statement [USSG § lBl.13] policy statement nor the commentary to it binds a district court addressing a prisoner's own motion under § 3582"). Therefore, this Court has authority to reduce his sentence pursuant to the Compassionate Release Statute and the First Step Act of 2018.

## THE DEFENDANT HAS EXHAUSTED HIS ADMINISTRATIVE REMEDIES WITHIN THE BOP.

The Defendant's motion rests upon Section 603 of the First Step Act of 2018 (FSA), where Congress has intended to grant district courts with discretion and statutory authority to review Defendant's compassionate release motions. A district court's authority is to determine whether a Defendant presents *"extraordinary and compelling reasons"* that warrant release. Additionally, Congress mandated that Defendants exhaust their administrative remedies within the BOP. A Defendant must request compassionate release from the Warden at the prison that he is incarcerated at before he petitions the Court. After his request is filed with the Warden, at least 30 days must pass before he can petition the district court. See ***Ross v. Blake***, 136 S. Ct. 1850 (2016); see also ***Andrew***, 12 F. 4th at 259. The Defendant has satisfied this requirement, as you will see from Exhibit A, which includes the Defendant's Request & the Warden's Denial.

## A DEFENDANT'S REFUSAL TO RECEIVE A VACCINATION DOES NOT PROHIBIT HIM FROM BEING GRANTED COMPASSIONATE RELEASE

The Defendant refused the vaccination because of fear of the side effects. Several Courts have considered a defendant's concerns regarding being vaccinated. Courts have agreed that this decision does not prevent a defendant from being released. See ***US v. Watson***, 2021 US Dist. LEXIS 119857 at 9 (ED Mich. 2021) (quoting) BOP Press Release Inmate Death at FCI Butner (LOW) (Sept. 17, 2021) (granting compassionate release to a defendant that refused vaccination. The Court held *"[M]oreover, the Court takes notice of Exhibit B to Defendant's reply, which is a series of sixteen alarming BOP Press releases in which an incarcerated individual tested positive for COVID-19 twice and eventually passed away . . . defendant had long term pre-existing medical conditions which have been recognized by the CDC as risk factors for developing more severe COVID-19 symptoms, tested positive twice and eventually succumbed to the virus"*) see also ***US v. Lum***, 2021 US Dist. LEXIS 21141 at n.19 (D. Hawaii 2021) (noting that the defendant's refusal to get the vaccination did not prevent him from receiving compassionate release. The court also noted that *"desiring more information about the vaccine before consenting to its administration is understandable . . . including the newness of the vaccine, its emergency approval by the FDA, and the number of*

*ailments,"* he had. This *"desire, is shared by many in the general public, and should not serve as an automatic disqualifying factor.")*

## ZERO COVID-19 CASES IN A PRISON IS NOT THE SAME AS ZERO CONFIRMED COVID-19 CASES.

The Defendant argues that just because a prison does not have any "confirmed" C0VID-19 cases, does not mean that the prison does not have any COVID-19 cases. See *US v. Manning*, 2021 US Dist. LEXIS 3695 at n.5 (D. NH 2021) (quoting) *US v. Amarrah*, 458 F Supp 3d 611, 618 (ED Mich. 2020) *("Zero confirmed COVID-19 cases is not the same thing as Zero COVID-19 cases. The BOP recently discussed this when it found that 70 percent of the inmates it tested were positive for the disease.").*

The *Amarrah* Court held that unless a prison facility *"implements a universal testing regiment, the Court gives no weight to the zero 'confirmed' COVID-19 cases particularized because the BOP is housing detainees together, and because basic disinfecting tools such as soap and hand sanitizer are not universally provided to the population. To the contrary, the Court finds the lack of testing aggravates its concerns about [defendant's] likelihood of contracting COVID-19."* Id.

## THE BOP'S MEDICAL CARE IS INSUFFICIENT FOLLOWING
## A DOJ INSPECTOR GENERAL'S REPORT.

Forbes Magazine reported last week that despite the BOP's overall goal that

*"health care [is] delivered to inmates in accordance with proven standards of care*

*without compromising public safety concerns inherent to the agency's overall*

*mission,"* it's standards are being compromised because of staffing shortages that

the agency has faced for years now. March 2022 DOJ Inspector General Report

found that the BOP *"lacks a reliable, consistent process in place to evaluate either*

*the timeliness of inmate health care or the quality of that care"* that *"the BOP*

*faced challenges in transporting inmates to off-site appointments which resulted in*

*a frequent need to reschedule appointments that could delay an inmate's health*

*care"*, the BOP did not have systems in place to track and monitor the causes for

rescheduling appointments and the BOP did not have a process in place to monitor

how long an inmate waited to receive care after a cancelled appointment. Forbes,

FBOP's Medical Care Falls Short of its Own Policy (April 19, 2022).


## THE BOP IS MISHANDLING THE PANDEMIC.

### A. <u>BOP Director Michael Carvajal resigned due to his mishandling of the BOP.</u>

In late November 2021, Senator Richard Durbin, Chairman of the Senate

Judiciary Committee, publicly demanded that BOP Director Carvajal be fired by

Attorney General Merrick Garland. Durbin's call came after the Associated Press reported that since the beginning of 2019, over 100 BOP workers have been arrested, convicted, or sentenced for crimes, including the FCI Dublin Warden (indicted for sexual abuse of women prisoners), an Associate Warden at MDC Brooklyn (charged with killing her husband last August) and correctional officers smuggling drugs (and weapons) and supervisors stealing BOP property.

The Associated Press's investigation found that the BOP is a hotbed of abuse, graft, and corruption, and has turned a blind eye to employees accused of misconduct. In some cases, the agency has failed to suspend officers who themselves had been arrested for crimes. In 2019, two-thirds of BOP-staff were indicted in criminal cases. On November 25, 2021, the DOJ Inspector General underscored Durbin's criticism. An IG report found that three years after the passing of the First Step Act, the BOP has failed implement major programs. On December 2, 2021, Senator Durbin once again stated that Carvajal *"has shown no intention of reforming the institution."* Durbin once again called for Carvajal to be fired. Durbin noted that Carvajal *"failed to respond to the pandemic and low staffing levels have hampered responses to emergencies."* Since then, Carvajal has resigned from the BOP.

The former Attorney General (William Barr) was given authority by Congress to release defendants from prison, considering the COVID-19 pandemic.

Additionally, former Attorney General William Barr instructed the BOP to devote all its resources to implementing numerous safety and health protocols. This consisted of prioritizing the use of its statutory authorities to grant home confinement for inmates seeking to transfer in connection with ongoing COVID-19 pandemic. See Memo from Attorney General, "Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic," March 26, 2020 (https://www.justice.gov/file/1262731/download).

At the top of 2021, the BOP promulgated clinical guidance regarding providing the inmate population and its staff COVID-19 vaccines. See COVID l9 Vaccine Guidance available at https://www.bop.gov/resources/pdfs/covid_19_vaccine_guidance_v14_0_2021.pdf . The government will argue that the BOP has administered nearly 80,000 vaccines and that the defendant is safe and not at risk. But the government's argument is not 100% accurate. The BOP did implement those things mentioned above. But are they adhering to them? The Defendant argues that they are not. And recent reports and past reports prove that the BOP has and still is, mishandling the COVID-19 pandemic.

## THE UNITED STATES DEPARTMENT OF JUSTICE, OFFICE OF INSPECTOR GENERAL IS INVESTIGATING THE BOP'S HANDLING OF THE COVID-19 PANDEMIC.

The News and Observer reported on January 28, 2021, the Federal Correctional Complex Butner, was the deadliest for COVID-19 in the BOP. The article bases its conclusion on findings from an Office of Inspector General report, which revealed *"improper usage of masks, risky inmate movements, and difficulty following the US Attorney General's directives to set up releasing at-risk inmates,"* were the primary factors.

The 46-page document, entitled "Remote Inspection of Federal Corrections Complex Butner," details the investigation findings. The OI investigation describes how nearly 1,200 of the approximately 3,500 inmates housed at the FCC tested positive, 27 died (with another death as recent as January).

More striking, is the number of inmates released under the Attorney General's directives. When it became clear that the COVID-19 pandemic was interfering with the safe and orderly operations of BOP facilities, the Attorney General released the March 26 memo mentioned above, at the height of the COVID-19 pandemic, only 41 inmates at FCC Butner were granted Home Confinement pursuant to the memo.

Additional findings at FCC Butner were:

1. Not complying with BOP quarantine guidelines, because of overcrowding and limited space.

2. Not quarantining inmates that tested negative for COVID-19 after being exposed to other inmates that tested positive.

3. Not restricting staff movements across the complex.

4. Staff were not changing PPE while moving from areas with positive cases into areas where inmates had tested negative.

5. Moreover, FCC Butner did not reduce its population in a timely manner.

## MARCH 18, 2021, SUB-COMMITTEE HEARING WITH BOP DIRECTOR ON THE RESPONSE TO COVID-19 PANDEMIC.

During the sub-committee hearing held on March 1, 2021, BOP Director Michael Carvajal defended his agency's response to the pandemic by saying the COVID-19 outbreak was "unprecedented." He claimed there were "a lot of lessons learned." The ACLU and the Marshall Project have filed a lawsuit against the BOP for its mishandling of the COVID-19 pandemic.

Representative David Trone (D-Maryland), grilled Carvajal over failing to work with his office in the past and expressed doubt about the BOP's ability to be cooperative with the congressman's office in the future. Congressman Trone went on to talk about his concerns with the BOP's implementation of the First Step Act of 2018, especially considering the pandemic. According to Trone, an independent review of the BOP found that "even with a full return to pre-COVID-19 activities" the BOP was "not on pace to fully implement" the First Step Act.

Other interesting topics brought up during the hearing included issues related to vaccines. According to Director Carvajal, even though all BOP staff have been offered COVID-19 vaccination, only 49% have accepted the offer. Multiple members of the sub-committee inquired as to whether the Director could compel staff to take the vaccine, to which the short answer was no.

## BOP STAFF'S COMPLAINT TO OSHA REGARDING UNSAFE WORKING CONDITIONS.

Nearly a year ago on March 31, 2020, staff members of the BOP filed a complaint with the Occupational Safety and Health Administration (OSHA), alleging that federal prisoners were "proliferating the spread" of COVID-19 and citing "imminent danger" at BOP facilities nationwide. See, https://www.nacdl.org/getattachment/65cffe9c-0b2b-4018-a7a4-d1006c262141/bop-osha-complaint.pdf .

The union listed 100 of 122 facilities nationwide with alleged safety or health hazards. (Id at p.5) The complaint details numerous failings by the BOP in maintaining a safe environment for its workers, and by extension, the inmates as well. Based on the BOP complaint there has always been a widespread belief among the rank of BOP staff that the facilities are unsafe and that the BOP has continued to not take actions necessary to prevent the spread of COVID-19.

## THE BOP IS UNDER REPORTING COVID-19 CASES.

According to a report from The Marshal Project (A State-by-State Look at Coronavirus in Prisons - April 2, 2021), until five weeks ago, the BOP was reporting the total number of inmates who had tested positive since the beginning of the pandemic. But since February 24, 2021, the BOP has not just been adding cases, but subtracting inmates who had once tested positive but who were no longer in custody. This accounting trick has let the BOP understate the total number of inmate cases by at least 1,115 (undoubtedly many more) through the end of March, reducing the BOP's positivity rate 44.5% to 42.75%.

The Marshall Project reported the BOP's sleight-of-hand, noting its weekly COVID-19 prison *"data no longer includes new cases from the [FBOP], which has had more prisoners infected than any other system. In early March, the BOP's totals begun to drop because they removed cases of anyone who was released, a spokesman said. As a result, we cannot accurately determine new infections in federal prisons."* The ACLU and other Watchdog groups contend the BOP's testing procedures are in adequate. Sharon Dolovic, the Director of the UCLA Law COVID-19 Behind Bars Data Project, told the Riverfront Times, *"We know that those are under-counts because there are many facilities that are reporting zero, or under ten or under twenty infections. And both because of what we know from COVID, and from what we have seen in countless facilities a year into the*

*pandemic, we know that if you're in a prison with 20 infections, you have more than 20 people infected."* (The Riverfront Times, Why Did a St. Louis Man Die in a Federal Prison: Coronavirus Hotspot March 24, 2021).

Maria Morris, director of ACLU's National Prison Project, said that BOP officials are motivated to under-count infections. *"And then they can say COVID isn't a problem in our facilities. Look at how low our numbers are."* Id.

A BOP spokesman denied the claims, saying, *"We carefully assess how to best ensure the safety of staff, inmates, and the public. All of our facilities are implementing the BOP's guidance on mitigating the spread of COVID-19."*

Sharon Dolovich replied to the Riverside Times *"Whatever policies they have on paper aren't actually being implemented."* Id *"So they could tell you things that actually sound good in theory. But when you actually talk to people incarcerated in the various facilities, they will tell you that the reality is very different."* Ibid.

The Philadelphia Inquirer reported in November of 2020 that "as of mid-October, US Attorneys were opposing inmate compassion release motions that were being housed at Fort Dix (Federal prison in New Jersey). But the paper noted "videos purportedly taken by a prisoner in Building 5812, and circulating among family members, show a unit in chaos with debris and trash everywhere. This was due to a shortage on staff."

**US SENATORS WANT BOP COVID-19 DEATHS INVESTIGATED.**

At times, COVID-19 cases were not counted as active cases at all. On March 24, 2021, an inmate died at USP Florence of COVID but did not test positive for the disease until after he was dead. See BOP Press Release, Inmate Death at USP Florence (March 24, 2021) https://www.bop.gov/resources/news/pdfs/20210324_press_release_flx.pdf .

Twenty-two US Senators asked the DOJ Inspector General on March 18, 2021, to review all BOP inmate COVID-19 deaths. Senator Elizabeth Warren said, *"Although BOP investigates each case involving the death of an individual in their custody, these one-off reviews of each individual COVID-19 related death may not be sufficient to determine system-wide failures in care across the entire federal prison system."* The Senators also wrote, *"A comprehensive review would not only provide a full accounting of the circumstances surrounding each individual loss of life but would also help policy makers establish whether appropriate BOP policies were in place and being followed in each case."* See Letter to Michael Horowitz from Senator Elizabeth Warren and others (March 18, 2021).

**INMATE CLASS ACTION SUIT AGAINST BOP.**

On March 22, 2021, a US District Court in Los Angeles ordered FCC Lompoc to let Dr. Homer Venters, a court-appointed prison epidemiology expert

back into the institution within the next month for a second inspection, with a deadline of May 12 to file his report with the court. In so ruling, the court rejected the BOP's argument that Venters is not a neutral expert. The Lompoc habeas corpus class action is set for a hearing on summary judgment motions on June 15. See *Torres v. Milusnic*, Case # 20-cv-4450, Order, ECF #191 (CD Cal. March 22, 2021).

### SECOND REPORT ON SUBCOMMITTEE WITH DIRECTOR OF BOP ON MARCH 18, 2021.

As mentioned above US Senators grilled BOP Director Michael Carvajal about only 49% of his employees being vaccinated. Congressman Ed Case CD-Hawaii) said with some incredulity, *"Something is wrong when half of the staff that can take it don't, it is a public health matter. We've got to get the guards vaccinated. It is a risk of health, safety, and welfare of those prisoners."* See House Subcommittee on Commerce, Justice, Science and Related Agencies, COVID Outbreaks and Management Challenges: Evaluating the Federal Bureau of Prison's Pandemic Response and the Way Forward (March 18, 2021).

Congressman Mike Garcia (R-California) asked Carvajal compare the BOP's management of COVID-19 to private prisons housing federal inmates. Carvajal responded, *"It's hard to compare them because our numbers are so different."* Id.

But the real fireworks were yet to come. Steve Palazzo (R-Mississippi) complained that his office was inundated by complaints from families of elderly, nonviolent inmates eligible for CARES Act release, but the BOP delayed home confinement placement. Id. Congresswoman Lawrence (D-Michigan) braced Carvajal about conditions at FCI Danbury, where, she said, female inmates were denied soap, medical supplies, and hygiene products, while being temporarily housed in the visitation room of the men's prison. The Director denied knowing about that but said that reports of harsh pandemic conditions were *"often mischaracterized or exaggerated."* He dismissed Lawrence's report: *"I don't believe that to the level that people didn't have them."* Id.

Finally, Congressman David Trone (D-Maryland) told Carvajal *"I recommended to the Biden Administration that you and your staff are incompetent and should be fired."* Ibid.

**THE DEFENDANT'S CAREER OFFENDER STATUS DOES NOT PROHIBIT THIS COURT FROM GRANTING HIM A SENTENCE REDUCTION AFTER BALANCING THE § 3553(a) FACTORS AND CONSIDERING HIS UNUSUALLY LONG SENTENCE.**

The Defendant argues that his status as a career offender does not prohibit this Court from granting him a sentence reduction. In the post First Step Act era, district courts have authority to grant sentence reductions to defendants that where once ineligible for reductions pursuant to § 3582.

Courts have commonly considered the length of a defendant's sentence, the qualification of his prior offenses, his post-sentencing rehabilitation, and the balancing of the 18 U.S.C. § 3553(a) factors, when granting sentencing reductions to career offenders. Congress provided authority to district courts to act as a parole officer, when considering whether a defendant has presented extraordinary and compelling reasons that warrant release, under the compassionate release statute of 1984. The Defendant will explain the Court's authority supra. In any event, this Court can reduce the Defendant's sentence.

**THE FIRST STEP ACT OF 2018, AND THE COMPASSIONATE RELEASE STATUTE OF 1984, PROVIDES DISTRICT COURTS WITH THE AUTHORITY TO REDUCE A DEFENDANT'S CAREER ENHANCED SENTENCE AFTER MAKING AN INDIVIDUALIZED ASSESSMENT BASED ON THE FACTS PRESENTED AND THE 18 U.S.C. § 3553(a) FACTORS.**

The Defendant argues that several factors qualify as extraordinary and compelling reasons and support his request for a reduction of his sentence. The Defendant was convicted of conspiracy to possess with the intent to distribute more than 500 grams of cocaine. He received a 480-month sentence after being deemed a career offender. He argues that his prior conviction under Miss. Code Ann § 41-29-139(a)(l) no longer qualifies as a predicate offense pursuant to USSG § 4B1.2. The US Supreme Court's decision in ***Concepcion*** grants authority to this

Court to consider whether he is still classified as a career offender. And absent this enhancement, his sentence would be substantially lower.

The Senate Judiciary Committee held in 1984 that compassionate release is appropriate when *"other extraordinary and compelling circumstances justifies a reduction of an unusually long sentence." **US v. Brooker***, 976 F.3d 228, 238 (2nd Cir. 2020) (quoting) S. Rep. No. 98-225 at 55-56 (1984); see also ***US v. Avery***, 2020 US Dist. LEXIS at 15 (WD Tenn. 2020) (quoting) S. Rep. 98-225 at 55-56 (August 4, 1984) *("The [Senate Judiciary] Committee believes that there may be unusual circumstances in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances.")*.

The Senate Judiciary Committee noted that a reduction in sentence *"would include cases in which extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.")*. ***Avery***, 2020 US Dist. LEXIS at 15, (quoting) S. Rep. No. 98-225 at 55-56. Indeed Congress *"seemingly contemplated that Courts might consider such circumstances when it passed the original compassionate release statue in 1984." **Brooker***, 976 F.3d at 238.

Congress "strongly disagree[d] with the Parole Commission and firmly established that the better view is that sentencing should be within the province of

the judiciary . . . In doing so, Congress rejected maintaining the expensive and cumbersome Parole Commission to determine if early release was appropriate and provide[d] instead [via] 18 USC § 3582(c) for court determination. . . of the question whether there is justification for reducing a term of imprisonment. *US v. Bass*, 2021 US Dist. LEXIS 28791 at 5 (ED Mich. 2021) (quoting) S. Rep. No. 98-225 at 54-56.

Effectively, through 18 USC § 3582(c), Congress placed the sentencing judge in the shoes of the "new defunct Parole Commission." Id; see also William W. Berry III, Extraordinary & Compelling A Re-examination of the Justifications for Compassionate Release, 68 Md. L. Rev. 850, 860-61 (2009) (citing) Crim. Div., US Dept. of Just. Prosecutors Handbook on Sentencing Guidelines & Other Provisions of the Sentencing Reform Act of 1984 at 121 (1987) explaining that this approach *"keeps the sentencing power in the judiciary where it belongs yet permits later review of sentences in particularly compelling situations."* Thus, the Compassionate Release Act was *"to serve as a 'safety valve' for sentence modification when justified by various factors that previously could have been addressed through the abolished parole system."* *US v. Vigneau*, 473 F. Supp. 3d 31, 36 (D. Conn. 2020).

## IN THE POST FIRST STEP ACT ERA DISTRICT COURTS HAVE GRANTED RELEASE TO DEFENDANT'S CONVICTED OF MURDER WITH MANDATORY LIFE SENTENCES.

The Defendant argues that pursuant to the First Step Act and Compassionate Release Act, district judges have granted release to defendants convicted of murders with mandatory LIFE sentences. See *US v. Perez*, 2021 US Dist. LEXIS 41040 at 9-10 (D. Conn 2021) (granting compassionate release to a defendant that served 23 years of incarceration and was sentenced to a mandatory LIFE sentence pursuant to 18 USC § 1958). The *Perez* Court also held "[B]ecause [defendant's] sentence was mandatory, this Court's first opportunity to functionally weigh the § 3553(a) factors in his case," was after he filed his compassionate release motion. Id; see also *US v. Somerville*, 463 F. Supp. 3d 855, 888-89 (WD Pa. 2020) (finding that the mandatory minimum sentence imposed by the Armed Career Criminal Act precluded the Court from considering the defendant's substantial mitigating circumstances, and those factors weighed in favor of compassionate release given the nature of his offense, his eight years of incarceration, his substantial rehabilitation, and his difficult upbringing).

The Defendant was sentenced as a career offender and the Court felt obligated according to USSG § 4B1.2. Although his guideline sentence was not mandatory the career range does not bar relief under the First Step Act or Compassionate Release Act; see *Perez*, 41040 at 12-13, see also *US v. Rodriguez*,

492 F. Supp. 3d 306 (SD NY 2020) (granting compassionate release to a prisoner serving a mandatory LIFE sentence without the possibility of parole for the murder of a government informant); *US v. Gluzman*, 2020 US LEXIS 131749 (SD NY 2020) (granting compassionate release to a defendant convicted of premeditated murder of her spouse and sentenced to a mandatory LIFE sentence; *US v. Rios*, 2020 US Dist. LEXIS 230074 (D. Conn. 2020) (granting compassionate release to a defendant convicted of VICAR murder and sentenced to mandatory LIFE); *US v. Tidwell*, 476 - 3d 66 (ED Pa. 2020) (granting compassionate release to a defendant sentenced to LIFE for murder in furtherance of a. continuing criminal enterprise).

Therefore, the district court erred when it held that it could not reduce the Defendant's Career Offender based sentence. His prior convictions do not qualify as under *US v. Junior Abreu*, Case No: 20-2786 (3rd Cir. 2022), and the Defendant would like to preserve this argument.

## SEVERAL DISTRICT COURTS HAVE GRANTED COMPASSIONATE RELEASE TO DEFENDANTS SENTENCED AS CAREER OFFENDERS AND APPLIED A TWO-LEVEL REDUCTION PURSUANT TO AMENDMENT 782.

The Defendant argues that several district courts have granted compassionate release to defendants that were classified as career offenders. In certain circumstances the court granted the defendant's request for a two-point reduction pursuant to Amendment 782 (all drugs minus two offense levels).

In *Trice*, the defendant was classified as a career offender with a sentencing guideline range of 262 to 327 months. *US v. Trice*, 2021 US Dist. LEXIS 23603 at 2-3 (WD Va. 2021). The Court held that, *"the career offender designation overstated [defendant's] criminal history, and in order to avoid sentencing disparities, it departed and varied downward from the guidelines and sentenced [defendant] . . . to 188 months."* Id. *Trice* filed a compassionate release motion and argued for a reduced sentence pursuant to "Amendment 782," and *"he was not a career offender at the time of his sentencing, nor is he today."* Id at 4. Finally, the Court reduced *Trice's* sentence to the guideline range that he would be subjected to absent the career offender designation (100 to 125 months). *Tirce's* sentence was reduced to TIME SERVED. Id.at 7-9.

In *Lawrence,* the defendant was classified as a career offender and subjected to a guideline range of 130-162 months. *US v. Lawrence*, 2021 US Dist. LEXIS 42604 at 2 (ED Mich. 2021) *Lawrence* argued that he no longer qualified as a career offender because his prior State conviction no longer qualified as predicates under USSG 4B1.l. Id.

The *Lawrence* Court held that his guideline range absent the career offender designation would be 57-71 months. Id. The Court acknowledged that *Lawrence's* crimes were "serious," and that was a need for his sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment,

and afford adequate deterrence. But the Court reasoned that ***Lawrence's*** *"obesity and the fact that his guideline range would be significantly lower today, extraordinary and compelling circumstances warranting release."* Id at 3-4.

In ***Vaughn,*** the defendant was classified as a career offender and subjected to a 262-to-327-month guideline range. *US v. Vaughn*, 2021 US Dist. LEXIS 6671 at 2-3 (SD VA 2021). The Court sentenced ***Vaughn*** to 188 months and indicated that, *"a lengthy sentence of imprisonment was necessary given [defendant's] criminal history."* Id at 2-3. The Court noted that ***Vaughn's*** sentence was *"nearly eight times as severe as the US Sentencing Guidelines would now recommend."* Id at 4. Finally, the Court noted that ***Vaughn's*** guideline range would be "a sentence of between 15 and 21 months of incarceration." Id at 7. ***Vaughn's*** sentence was reduced to TIME SERVED.

Other district courts have followed suit and granted compassionate release to defendant's that were deemed as career offenders. See ***US v. Kanohokula***, 2021 US Dist. LEXIS 223211 at 14-15 (D. Hawaii 2021) *("This Court adopts the view that non-retroactive changes in law regarding 'career offender' designations can constitute extraordinary and compelling reasons to reduce sentences under § 3582(c)(l)(A) when considered an individual basis");* see also ***US v. Fennel***, 2021 US Dist. LEXIS 213621 at 12-15 (WD Va. 2021) (granting compassionate release and considering Amendment 782 (reducing sentence to 212 months from 360

months)); *US v. Reyes*, 2021 US Dist. LEXIS 238866 at 9 (WD NC 2021)

(reducing sentence from 260 months to TIME SERVED, while noting that his

*"prior Texas convictions no longer qualify as 'controlled substance' offense[e]."*);

*US v. Somerville*, 463 F. Supp. 3d 5858, 602, 605 (WD Pa. 2020) (reducing a 15

year sentence under the Armed Career Criminal Act to 8 years); *US v. Hadley*, 389

F. Supp. 1043, 1047-48 (MD FL 2019) (reducing a defendant's mandatory LIFE

sentence pursuant to § 851 and § 4bl.1 Career Offender, to TIME SERVED).


## DISTRICT COURTS HAVE GRANTED COMPASSIONATE RELEASE AND SENTENCE REDUCTIONS TO DEFENDANTS CONVICTED OF CRACK COCAINE OFFENSES, POSSESSING A FIREARM DURING A DRUG TRAFFICKING CRIME (924(c)), BEING A FELON IN POSSESSION OF A FIREARM AND DEEMED CAREER OFFENDERS.

The Defendant argues that district courts have granted compassionate release

or sentence reductions to individuals that are similarly situated as him. He argues

that these cases create a disparity among similarly situated defendants. See 18 USC

§ 3553(a)(6).

A district court in the Western District Pennsylvania recently granted

compassionate release to a defendant convicted of distributing crack cocaine,

carrying a firearm during a drug trafficking crime, and being a felon in possession

of a firearm. See *US v. Northcutt*, 2021 US Dist. LEXIS 29152 (WD PA. 2021).

The Court noted that *Northcutt* had an extensive criminal history and at his

original sentencing hearing he qualified as a career offender. Id at 11. The Court also noted absent the career offender guidelines ***Northcutt's*** range would be "200-235," instead of 270 months. Id. Additionally, in balancing the § 3553(a) factors, the Court held that ***Northcutt's*** offenses *were "undoubtedly serious -- involving his flight from law enforcement and the discovery of crack and a gun in the vehicle he abandoned -- it was violent."* Id at 11. Finally, the Court noted that reducing his sentence was not creating a disparity among similarly situated defendants. Id.

In another case a district court granted compassionate release to similarly situated defendant held:

> *"To be clear, this is not a case where someone was wrongfully accused and convicted. Nor does it involve an unfair sentence. Defendant was part of a violent street gang that distributed drugs, shot people, intimidated citizens, and tried to bribe a juror. They went to trial and showed no remorse. Normally that would be the end of the matter . . . But the changes to the law allow this Court to review the motion for compassionate release . . . However, granting relief today in no way criticizes the original prosecution and sentencing."*

***US v. Davis***, 2021 US Dist. LEXIS 103081 at 2 (WD NC 2021); see also Id at 2-3 (The defendant "participated in a highly disciplined and violent drug trafficking organization," the members "sold crack cocaine," "use [and] carried assault rifles," "shotguns," "Uzi," "destructive devices," "developed a reputation for violence,"

"on two occasions" during the defendant's participation in the conspiracy, he and some of his co-defendants "used and carried firearms").

In ***Curry***, the district court granted compassionate release to a defendant serving a LIFE sentence for distributing crack cocaine, powder cocaine, marijuana, being a felon in possession of a firearm, and possessing a firearm during a drug trafficking crime. ***US v. Curry***, 2021 US Dist. LEXIS 122812 at 12-13 (MD NC 2021). The Curry noted that his *"present offense was serious and repetitive," "both times he was released on bond, and re-engaged in his drug trafficking,"* his *"pattern of criminal conduct--notably, his continued drug activity that was ongoing while released on bond and despite two prior arrest at the time of his arrest, the fact that he attempted to escape from custody after his jury verdict in this case."* Id.

In ***Banks*** the district court granted compassionate release to a defendant deemed as a career offender who plead guilty to distributing crack cocaine, given a two-point enhancement for possessing a firearm during a drug transaction, and another two levels for obstruction of justice, because he, *"recklessly created a substantial risk of death or serious bodily injury to another person."* ***US v. Banks***, 2022 US Dist. LEXIS 13787 at 2-3 (WD VA. 2022).

In ***Bass,*** the district court granted compassionate release to a defendant serving a LIFE sentence convicted of a conspiracy to distribute 5 kilograms of

cocaine, 50 grams of crack, using a firearm to commit murder in furtherance of a drug trafficking crime. *US v. Bass*, 2021 US Dist. LEXIS 11719 at 2-3 (ED Mich. 2021); see also id at 13 *("There is no question that [defendant's] offenses were horrific, for years, [defendant's organization] inflicted harm on its own members and members of the community alike")*; *US v. McClellan*, 2020 US Dist. LEXIS 97136 at 2-3 (ND Ohio 2020) (granting compassionate release to a defendant sentenced to LIFE, plus 25 years (consecutive). The defendant was a career offender convicted of distributing cocaine, crack cocaine, being a felon in possession of a firearm, and using a firearm during a drug trafficking crime); *US v. Phillips*, 409 F. Supp._3d 180, 182 (SD NY 2020) (granting compassionate release to a defendant that was part of *"[a] Harlem based organization that sold hundreds, of kilograms of crack and powder cocaine, and the conspiracy of many acts of violence."* Defendant plead guilty to racketeering conspiracy, possession of a firearm in relation to a drug trafficking crime, and conspiracy to assault with a dangerous weapon); *US v. Williams*, 2020 US Dist. LEXIS 102393 (D. Minn. 2020) (granting compassionate release to a defendant serving a 300 month sentence for possession with the intent to distribute crack, conspiracy to distribute cocaine, and possession of a firearm during a drug trafficking crime); *US v. Olivaries*, 2020 US Dist. LEXIS 91535 (D. SD 2020) (granting sentence reduction to a defendant sentenced to LIFE, despite his classification as a career offender and

conviction for distributing crack); *US v. Jenkins*, 460 F. Supp. 3d 1121 (D. CO 2020) (granting compassionate release to a defendant convicted of conspiracy to distribute crack cocaine and possessing a firearm during a drug trafficking offense); *US v. Lewis*, 2020 US Dist. LEXIS 156842 at 2-3 (WD Wash. 2020) (granting compassionate release to a defendant convicted possession with the intent to distribute crack, being a felon in possession of a firearm, and deemed an Armed Career Criminal).

Therefore, this Court has ample authority to grant the Defendant's request for a sentence reduction.

## THE DEFENDANT'S SENTENCING GUIDELINE WOULD BE SUBSTANTIALLY LOWER IF HE WAS SENTENCED TODAY.

The Defendant argues that if he were resentenced today under the career offender guidelines, he would receive a substantially lower sentence. The Defendant plead guilty to a charge of conspiracy to possess with the intent to distribute 500 grams or more of cocaine. The Probation Office assessed his base offense level at 36 (Criminal History Category VI) and was enhanced by five points for importation and a mitigating role in during this offense. This brought his offense level to 41, minus 3 points for acceptance of responsibility, which resulted in an offense level of 38. The Defendant's guideline range was 360 months to LIFE. Pursuant to the plea agreement, the government recommended that the

Defendant be sentenced in the lower 25% of the applicable guideline range. The Defendant was sentenced to 480 months, which is a range between the 360 months to LIFE guideline range.

If the Defendant were sentenced today, his career offender guideline range would be 34 plus a five-point enhancement to base level 39 and then reduced by three points for acceptance of responsibility, which results in a base level of 36. His sentencing guideline range would be 324 months to 405 months. (Without considering the government's recommendation of a sentence 25% lower than the low end of the applicable guideline range. The Defendant argues that 25% of 324 months is an 81-month reduction. This would result in a guideline range of 343 months. This is substantially lower than his 480-month sentence.

## THE US SUPREME COURT'S RULING IN *CONCEPCION*

The US Supreme Court recently held that in the scope of a First Step Act motions, district courts, "may consider other intervening changes of law (such as changes to the sentencing guidelines) or changes of facts (such as behavior in prison) in adjudicating a First Step Act motion." *Concepcion v. US*, 597 US (June 27, 2022). The *Concepcion* Court also held that Congress did not limit "the scope of information that a district court may consider in deciding whether, and to what

extent, to modify a sentence, that a district court's discretion consider information retained." Id.

## THE DEFENDANT'S PRIOR CONVICTIONS UNDER MISS. CODE ANN. § 41-29-139(a)(1) DOES NOT QUALIFY AS A PREDICATE PURSUANT TO USSG § 4B1.2

The Defendant argues that his prior conviction under Miss. Code Ann § 41-29-139 no longer qualifies as a predicate pursuant to USSG § 4B1.2. Under Mississippi law, "[I]t is unlawful for a person knowingly or intentionally: (1) To sell, barter, transfer, manufacture, distribute, dispense, or possess with the intent to sell, barter, transfer, manufacture, distribute, or dispense, a controlled substance." Miss. Code Ann. § 41-29-139(a)(1).

Under Mississippi law, "distribute" means to deliver other than by administering or dispensing a controlled substance," and "deliver" or "delivery" is defined as, "actual, constructive, or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship." Miss. Code. Ann. § 41-29-105(h) & (i).

The Defendant argues that an attempted transfer of a controlled substance is not a controlled substance offense, because the Sentencing Commentary does not include this offense in its definition of a controlled substance. See *US v. Havis*, 929 F.3d F.3d 317; 319 (6th Cir. 2019) Sutton J. concurring in denial of enbanc

reconsideration) (noting that the term "attempted transfer" as used to define "delivery" in a drug trafficking statute, takes it as "ordinary" meaning, rather than "legal term of art" meaning); see also *US v. Winstead*, 890 F.3d 1082, 1091 (D.D.C. 2018) ("Section 4B1.2(b) presents a very detailed "definition" of controlled substance that clearly excludes inchoate offenses"); *US v. Nasir*, 982 F.3d 144, n. 10 (3rd Cir. 2019) ("The guidelines do not even mention inchoate offenses"); *US v. Swinton*, 797 F. Appx 582, 602 (2nd Cir. 2021) (citing *Havis* and *Winstead* and holding the guidelines do not include the attempted sale of a controlled substance).

"An inchoate offense is "[a] step toward the commission of another crime, the step itself being serious enough to merit punishment inchoate offenses includes for example the attempt, conspiracy, and solicitation of a crime." *Nasir*, 982 F.3d at n. 10.

Recently, in *Abreu*, the Third Circuit held the district court in *Havis* determined that defendant qualified for career offender status based in part upon a prior Tennessee conviction for violating a statute that prohibited the sale and delivery of cocaine. The parties agreed that under Tennessee law, delivery included "attempted transfer" as the least culpable conduct. Relying on the commentary to the Guidelines, the district court held that the Guidelines generic definition of a controlled substance offense also included attempted offenses.

By doing so, the Sixth Circuit observed, the district court impermissibly utilized the commentary expand the substance offense included in the Guidelines, even though Congress was never presented with the commentary – unlike the Guidelines themselves which Congress had the opportunity to modify or reject each guideline before it took effect. *US v. Havis*, 927 F.3d 382, 387 (6th Cir. 2019) (enbanc); see also *Stinson v. US*, 508 US 36, 44 (1993).

The Sixth Circuit also permitted defendants to challenge their career offender status in compassionate release motions. See *US v. Mc Call*, 20 F.4th 1108 (6th Cir. 2021) ("the district court abused its discretion by not considering the disparity in [defendant's] sentence post *Havis* along with his efforts at rehabilitation and the presence of COVID-19.")

The Defendant argues that his prior conviction (Harris County Circuit Court, Gulfport, Mississippi case #B2401-2010-187) pursuant to Miss. Code Ann § 41-29-139 and federal conspiracy conviction (Southern District of Mississippi case no: 97-cr-21) are not controlled substances offenses, pursuant to 4B1.2. As argued above Miss. Code Ann. § 41-29-139 (attempted transfer) and 21 USC §846 (conspiracy to possess with the intent to distribute crack/cocaine) both encompass conduct that is outside of the scope the Guideline commentary. The Guideline commentary does not include attempted transfer of a controlled substance and

inchoate offenses (conspiracy). Therefore, the Defendant respectfully asks to be resentenced without the career offender enhancement to a term of 120 months.

## THIS COURT CAN GRANT RELIEF AFTER BALANCING THE SENTENCING FACTORS SET FORTH IN 18 USC § 3553(a).

This Court has the authority to grant the Defendant's request for a sentence reduction after balancing the sentencing factors set forth in § 3553(a). Several courts have used these factors to reduce a defendant's LIFE sentences for murder. The Courts considered the national average for federal murder being around 22 years. Even the Court's agreed that a sentence of 25 years for murder was sufficient but not greater than necessary and promoted respect for the law.

A court fails when it recognizes that it not only possessed the authority to reduce his sentence to time served, but the court also had authority to reduce his sentence a term of imprisonment that is warranted by § 3553(a). See *US v. Henderson*, 2020 US Dist. LEXIS 216790 at 5 (ED Va. 2020) (quoting) *US v. Rodriguez*, 492 F. Supp. 3d 306, 310 (2020) (citing) *US v. Brooker*, 976 F.3d 228 (2nd Cir. 2020) *("In Rodriguez, Judge Jed. S. Rakoff observed that the US Court of Appeals for the Second Circuit 'recognized that [compassionate release] statute provided . . . flexibility [in sentencing] . . . thus, allowing a [sentence reduction] in this case'")*; *US v. Legette-Bey*, 2021 US Dist. LEXIS 10165 at 2 (ND. Ohio 2021)

(quoting) **Brooker**, 976 F.3d at 237 *("While frequently thought of as requiring immediate release, the statute allows a district court to 'reduce but not-eliminate' a defendant's prison sentence[.]")*. Therefore, the district court erred when it held that it did not have the authority to reduce the Appellee's sentence to any term of imprisonment, besides time served.

## DISTRICT COURTS HAVE REDUCED DEFENDANT'S CONVICTED OF MURDER AND SENTENCED TO LIFE AFTER BALANCING THE § 3553(a) FACTORS.

As argued above, the Defendant argues that the § 3553(a) factors warrant a reduction in his sentence. Several district courts have granted compassionate release to defendants with LIFE sentences, after carefully balancing the § 3553(a) factors.

The **Rodriguez** Court held:

> *"As discussed above, [defendant] seeks his immediate release - that is, a sentence reduction to time served. After considering §3553(a) factors, however, the Court finds that such an extreme reduction would not reflect the seriousness of, or provide just punishment for, hi egregious participation in the brutal murder of a government informant. Nevertheless, the Court concludes that a more modest sentence reduction to a term of 30 years imprisonment, to be followed by a lifetime of supervised release, is both warranted by the above-described extraordinary and compelling circumstances and appropriate in light of the Section 3553(a) factors."*

492 F. Supp3d at 313.

The ***Rodriguez*** Court further noted "[a] 30-year sentence - that is a sentence 50% greater than the average federal murder sentence - reflects the fact the defendant's crimes were hardly ordinary and deserve substantial punishment." Id at 316; see also Id *("This lengthy time is also a period of time that promotes respect for the law and provides just punishment for his offenses, even where the defendant was originally sentenced to life imprisonment")*.

Several other district courts have considered a defendant's underlying conduct pertaining to their murder convictions but decided to reduce their sentence considering § 3553(a). See ***US v. Regas***, 2020 US Dist. LEXIS 98402 at 10 (CD Cal. 2020) (granting compassionate release to a defendant that served 27 years in prison on a LIFE sentence for operating a continuing criminal enterprise and holding, *"[W]hile the Court agrees that the nature and circumstances of defendant's underlying offense are serious, evidence of defendant's post-sentencing rehabilitation favors a sentence reduction")*; see also ***US v. Parker***, 461 F. Supp. 3d 966, 982 (CD Cal. 2020) (granting release to a corrupt officer that served 22 years on a LIFE sentence for operating a continual criminal enterprise. The Court noted, *"[W]ith respect to the Section 3553(a)(3), '[i]ncarceration . . . is not the only kind of sentence available. To the contrary', [n]on custodial sentences also curtail prized liberty interests and defendant always faces harsh consequences that wait if he violates the conditions attached to such sentence")*; ***US v.Tidwell***, 476 F.

Supp. 3d 66, 70 (ED Pa. 2020) (granting compassionate release to a defendant that served 26 years on a LIFE sentence for operating a continuing criminal enterprise, that included murder. The court held, *"The government asserts that based on [defendant's] status as a 'violent drug offender[],' his continued incarceration is necessary. The Court disagrees. The [defendant] is terminally ill, has already served over 25 years in federal custody and this 25-year duration has consumed a large part of his life and by any measure represents a very substantial punishment that reflects the seriousness of his offense and the need for general or specific deterrence."*)

## THE FIRST STEP ACT GIVES DISTRICT COURTS AUTHORITY TO CONSIDER THE APPELLATE'S MITIGATING FACTORS THAT WARRANT A REDUCTION.

Once again, in the First Step Act era, district court judges are permitted to consider the Defendant mitigating arguments in support of his sentencing reduction. At his original sentencing hearing, the career enhanced sentence prohibited the court from considering any mitigating arguments that he presented. He as convicted and found guilty, and the only thing left to do was pronounce his enhanced sentence. The sentencing Court was not obligated, as the current district courts are now, *"to make an individualized assessment based on the facts presented and impose a sentence, sufficient, but not greater than necessary, to*

satisfy the purposes of criminal law." ***Gall v. US***, 552 US 38, 50 (2007). Nor is there any reason to believe that the sentence then imposed reflected a determination by the Court that a LIFE sentence was required to vindicate the purpose of criminal law. ***US v. Gluzman***, 2020 US Dist. LEXIS 131749 at 61-62 (SD NY 2020).

The ***Gluzman*** Court considered the exact argument and granted compassionate release to a woman that was convicted of the premeditated murder of her husband. See ***Gluzman***, 131749 at 61-62 *("Consistent with that [defendant] has served 24 years of her life in a federal penitentiary. Such a lengthy period of time reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. It also affords adequate deterrence to criminal conduct. As noted above, it also served to protect the public from further crimes [defendant] (to the point where she no longer presents a safety risk) . . . and it provides [defendant] with significant opportunities for educational and character growth-opportunities that she has seized")*.

Several courts have noted that the national guideline range for federal murder is around 22 years, and in most State Courts, a defendant will be paroled on a murder after serving around 13 to 15 years. See ***US v. Cruz***, 2021 US Dist. LEXIS.68857 at 18 (D. Conn. 2020) (granting compassionate release and observing that defendant was now 45 years old and had been incarcerated since he

was 18 years old, which amounted to 60% of his life in prison. The Court noted,

*"[t]his as an unusually long sentence is further supported by the fact that the*

*national average...sentence for murder...[was] 22 years"*); see also ***Gluzman***,

131749 at 61-62 (comparing the length of sentences for federal murder and murder

committed in the State of New York).


## THIS COURT HAS AUTHORITY TO CONSIDER A DEFENDANT'S POST-SENTENCING REHABILITATION WHEN BALANCING THE 18 USC § 3553(a) FACTORS.

A sentencing Court should "recognize" the "extensive evidence" of a

defendant's self-rehabilitation since his initial sentencing, because it is "clearly

relevant to the selection of an appropriate sentence." Id. Most fundamentally,

evidence of a defendant's conduct since his first sentencing "provides the most up-

to-date picture of [a defendant's] 'history and characteristics'." Ibid; see also ***US v.***

***Easter***, 975 F.3d 318, 327 (3rd Cir. 2020) (quoting) ***Pepper***, 562 US at 491 *("Post-*

*conviction conduct often recast the 'history and characteristics' of a defendant as*

*he stands in front of the court")*; That is because conduct after sentencing is

*"plainly relevant to 'the history and characteristics of the defendant', pertinent to*

*the need for sentence imposed"* and may *"critically inform a sentencing judge's*

*overreaching duty under § 3553(a) to impose a sentence sufficient, but not greater*

*than necessary: to comply with the sentencing purpose set forth in § 3553(a)(2)."*

**US v. Murphy**, 998 F.3d 549, 546-57 (3rd Cir. 2020).

See Exhibit B, Defendant's Post-Sentencing Programming Certificates, FBOP Challenge Program documentation and lastly Suicide Companion Certification.

## THE DISTRICT COURT CAN IMPOSE SPECIAL TERMS OF SUPERVISED RELEASE TO COMBAT DANGEROUSNESS.

The Defendant argues that if this Court believes that he continues to pose a danger to the community, then it may impose special terms of supervised release. See **US v. Hodges**, 2021 US Dist. LEXIS 58090 at 23 (ED KY. 2021) ("The Court has seriously weighted the government's undeveloped argument that release after serving only a portion of his sentence fails to honor the punitive aspects of the sentencing factors. But [Defendant] is not getting a get-out-of jail free card. Rather, he will serve a significant period of time under strict conditions of home confinement, a serious and significant restraint on his liberty. Further, he will be monitored by the US Probation Office."); see also **US v. Gray**, 416 F. Supp. 3d 7849 791-93 (SD Ind. 2019) (Imposing nineteen conditions of supervised release to "assist the probation officer in monitoring the defendant for protection of the community." "To reduce the risk of recidivism [and] provide public safety. To assist in defendant's rehabilitation; and assure that defendant maintains gainful

employment"; ***US v. McGraw***, 2019 US Dist. LEXIS 78370 at 17-21 (SD Ind. 2019) (Imposing the same nineteen supervised release conditions as ***Gray***).

Therefore, this Court would be well within its authority to impose "special terms" of supervised release upon the Defendant's release.

## THE DEFENDANT REQUESTS APPOINTMENT OF COUNSEL.

The Defendant requests to be appointed legal counsel to further assist him in the litigation of his compassionate release motion. The Defendant's safety is critical, and the BOP is still operating under strict COVID-19 protocols. At any given time, his institution could be on lockdown. Additionally, the defendant's classification as a Career Offender and disparity in offenses involving crack cocaine, warrant a sentence reduction.

## CONCLUSION

Mr. Casey has a family that loves and cares for him and are ready and willing to assist him with a successful reentry. If released, Mr. Casey would live with his wife Stacy Bullard Casey, and their children at 1437 Genevieve Drive, Gulfport, MS 39501. See Exhibit C which are letters of support from family & friends.

It should be noted that Mr. Casey has never been convicted of a violent crime, nor has he had any disciplinary writeups since his incarceration in 2014. This alone is testament to the man he is. No disciplinary writeups in federal facilities is no easy feat, and for that he should be commended.

WEREFORE, the Defendant respectfully asks this Court to reduce his sentence to a term of 120 months, or whatever this Court deems necessary for the case at hand.

Respectfully Submitted,

Kenneth Casey

Dated: November 17th, 2022

# CERTIFICATE OF SERVICE

I, Kenneth Casey, hereby certify that on this 17th day of November 2022, I did place the Motion for Compassionate Release/Reduction in Sentence Pursuant to 18 USC 3582(c)(1)(A) and The First Step Act of 2018, in the prison mailing system addressed to the following parties:

> United States District Clerk of Court
> Southern District of Mississippi
> Dan M. Russell, Jr., United States Courthouse
> 2012 15th Street, Suite 403
> Gulfport, MS 3950

> United States Attorney's Office – Via ECF

Signed under the penalty of perjury

this 17th day of November 2022.

Kenneth Casey    by POA
_____    Stacy Bullard-Casey
Kenneth Casey